1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                  SOUTHERN DISTRICT OF CALIFORNIA

10  Garry McCullough,                          Civil No.    09cv1808-AJB(NLS)

11                              Plaintiff,     **ORDER GRANTING IN PART AND
                                               DENYING IN PART DEFENDANT'S**
12            v.                               **MOTION FOR SUMMARY**
                                               **JUDGMENT**
13  Lennar Corporation, a corporation, and DOES
    1 through 10, inclusive
14                              Defendants.    **[Dkt. No. 46.]**

15

16          Plaintiff Garry McCullough brought this action against Defendant Lennar Corporation

17  ("Lennar") alleging numerous causes of action regarding his termination of employment by

18  Defendant Lennar.  On November 22, 2010, Defendant Lennar filed a motion for summary judgment

19  or, in the alternative, motion for partial summary judgment.  McCullough filed an opposition on

20  January 13, 2011.  Lennar filed a reply on January 24, 2011.  On February 1, 2011, Plaintiff filed an

21  opposition response to Defendant's reply.  On February 7, 2011, Defendant filed a sur-reply to

22  Plaintiff's opposition response.  The motion is submitted on the papers without oral argument,

23  pursuant to Local Rule 7.1(d)(1).  Upon a careful review of the record and applicable law, the Court

24  GRANTS in part and DENIES in part Defendant's motion for summary judgment.

25                              **Factual Background**

26          Defendant Lennar is engaged in the business of residential new home construction.

27  (Plaintiff's Notice of Lodgment ("PNOL"), Ex. 8, Farley Depo. at 18:13-19:13.)  Plaintiff was born

28  on November 11, 1954.  (Id., Ex. 3, Pl's Depo. at 13:7-8.)  Plaintiff has been in the construction

1   industry his entire working life.  (Id., Ex. 1.)  From 2000 to early 2005, Plaintiff was working for

2   Hallmark Communities as an Offsite Construction Manager.  (Id.)   Around June 2005, Plaintiff was

3   contacted by a recruiting firm about whether he would be interested in a job with other

4   homebuilders, including Defendant Lennar.  (Id., Ex. 3, Pl's Depo. at 55:17-56:9.)   He was

5   interested in the job with Lennar because he would earn more money.  (Id. at 60:7-9.)

6       Plaintiff interviewed for a position as Area Manager with Mark Porter, Lennar's San Diego

7   Division Operations Manager.  (Id., Ex. 4, Porter Depo. at 26:18-20.)  The position of Area Manager

8   was to provide "direct oversight over the horizontal construction[1] and improvements to any one of

9   our developments."  (Id., Ex. 8, Farley Depo. at 18:16-23.)  Direct oversight in the home building

10  business involving the use of subcontractors for most of the work would require the area manager

11  "to make sure that that work was happening, it was happening on time, and within budget, and that

12  there was someone there to manage the oversight of those activities."  (Id. at 18:24-19:9.)

13      Plaintiff was offered the Area Manager position with Lennar in an Offer Letter dated June

14  15, 2005 which he signed.  (Pusateri Decl., Ex. B.)  Plaintiff was offered $95,000 a year, an auto

15  allowance and he was eligible to participate in the bonus program in fiscal year 2005.  (Id.)  Mark

16  Porter, the Operations Manager, was Plaintiff's supervisor.  (PNOL, Ex. 4, Porter Depo. at 40:19-

17  20.)  Porter was in charge of the people in the field; made sure the project was timely, on budget;

18  and was a liaison between the field and the office.  (Id. at 40:19-25.)  At the time Plaintiff was hired,

19  Pete Fagrell was the Vice President of Land Acquisition and Porter's superior.  (Pusateri Decl., Ex.

20  A, Pl's Depo. at 68:16-69:4.)  Later, Mike Farley, Vice President of Land Acquisition, became

21  Porter's supervisor.  (PNOL, Ex. 8, Farley Depo. at 16:1-24; Pusateri Decl., Ex. I, Porter Depo. at

22  15:10-12.)  Mike Levasque was the Division President.  (Pl's Opp. at 10, line 4.)

23      Plaintiff began working at Lennar on July 5, 2005.  (Pusateri Decl., Ex. B; PNOL, Ex. 3, Pl's

24  Depo. at 84:21-85:3.)  Plaintiff was awarded a $15,000 bonus for the 2005 fiscal year and $24,862

25  bonus for the 2006 fiscal year but not given a bonus for the 2007 fiscal year.  (Garraffo Decl., Exs. A

26  & B.)

27  ────────────────

28      [1]Horizontal construction refers to offsite work which includes grading and getting the land ready
    for construction.  (Pusateri Decl., Ex. A, Pl's Depo. at 65:1-5.)   Vertical construction is defined as
    everything from the slab up, which is sticks, bricks . . . . building the actual house."  (Id. at 64:16-24.)

On September 6, 2007, Plaintiff was involved in an altercation with a coworker.  (PNOL, Ex. 3, Pl's Depo. at 271:19-273:15.)  Lennar's policies prohibit harassment and workplace violence. (Garraffo Decl., Ex. D.)  As a result of the altercation, Lennar decided to terminate Plaintiff's employment.  (Garraffo Decl., Ex. E.)  However, Defendant reversed the termination decision after Plaintiff provided the human resource department with a doctor's note which stated that Plaintiff had diabetes and that high or low blood sugar could cause him to behave irrationally.  (Pusateri Decl., Ex. G.; Garraffo Decl., Ex. E.)  In May 2008, Plaintiff's employment was terminated.

**Procedural History**

On June 30, 2009, Plaintiff filed this action in San Diego Superior Court.  On August 20, 2009, Defendant removed the action to this Court.  (Dkt. No. 1.)  On August 27, 2009, Defendant filed a motion to dismiss the complaint.  (Dkt. No. 5.)  On September 14, 2009, Plaintiff filed a first amended complaint.  (Dkt. No. 8.)  On September 21, 2009, the court denied the motion to dismiss as moot.  (Dkt. No. 10.)  In the first amended complaint, Plaintiff alleges the following causes of action: (1) "discrimination in violation of [California] Government Code § 12940 (age and disability)"; (2) wrongful termination in violation of public policy; (3) breach of contract - failure to pay overtime compensation; (4) unfair competition; and (5) unjust enrichment.  (Id.)

On September 28, 2009, Defendant filed a motion to dismiss the first amended complaint. (Dkt. No. 11.)  On November 10, 2009, the Court denied the motion to dismiss.  (Dkt. No. 15.)  On November 22, 2010, Defendant Lennar filed a motion for summary judgment or, in the alternative, motion for partial summary judgment.  (Dkt. No. 46.)  McCullough filed an opposition on January 13, 2011.  (Dkt. No. 49.)  Lennar filed a reply on January 24, 2011, adding 45 pages of new evidence.  (Dkt. No. 50.)  Therefore, on January 26, 2011, the Court permitted Plaintiff to file a response to the new evidence submitted by Defendant with its reply and also allowed Defendant to file a sur-reply to Plaintiff's response.  (Dkt. No. 51.)  On February 1, 2011, Plaintiff filed an opposition response to Defendant's reply.  (Dkt. No. 52.)  On February 7, 2011, Defendant filed a

1  sur-rely to Plaintiff's opposition response.[2]  (Dkt. No. 53.)

2  **Discussion**

3  **I.     Legal Standard for Motion for Summary Judgment**

4  Federal Rule of Civil Procedure 56 empowers the Court to enter summary judgment on

5  factually unsupported claims or defenses, and thereby "secure the just, speedy and inexpensive

6  determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 325, 327 (1986).  Summary

7  judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on

8  file, together with the affidavits, if any, show that there is no genuine issue as to any material fact

9  and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56©.  A fact is

10  material when it affects the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

11  248 (1986).

12  The moving party bears the initial burden of demonstrating the absence of any genuine issues

13  of material fact. Celotex Corp., 477 U.S. at 323.  The moving party can satisfy this burden by

14  demonstrating that the nonmoving party failed to make a showing sufficient to establish an element

15  of his or her claim on which that party will bear the burden of proof at trial. Id. at 322-23.  If the

16  moving party fails to bear the initial burden, summary judgment must be denied and the court need

17  not consider the nonmoving party's evidence. Adickes v. S.H. Kress & Co., 398 U.S. 144, 159-60

18  (1970).

19  Once the moving party has satisfied this burden, the nonmoving party cannot rest on the

20  mere allegations or denials of his pleading, but must "go beyond the pleadings and by her own

21

22  [2]In its sur-reply, Defendant argues that Plaintiff, by filing additional new evidence in its response to the new evidence submitted by Defendant with its reply, violated the Court's minute order dated
23  1/26/11 which authorized Plaintiff to file a response to address the evidence submitted with Defendant's reply. (Dkt. No. 53 at 1.)  Defendant also contends that the response violates the page limit rules and
24  requests the Court to strike portions of Plaintiff's response in excess of the 10 page limit.  (Id.)  First, the Court notes that because Defendant initially improperly filed 45 pages of new evidence with its reply
25  brief, the Court allowed Plaintiff to file a response the new evidence submitted by Defendant. Therefore, Plaintiff should be allowed the opportunity to oppose Defendant's evidence with its own
26  evidence.  Furthermore, Defendant was given an opportunity to address these additional documents in its sur-reply.  Defendant has shown no prejudice.  In addition, it does not appear that Local Civil Rule
27  7.1(h) applies to responses to a reply and a sur-reply.  Rule 7.1(h) concerns briefs in support of or in opposition to motions and to a reply. See Local Civ. R. 7.1(h).  It does not address briefing beyond the
28  reply.  In addition, the Court did not set a page limit in its minute order.  Accordingly, the Court DENIES Defendant's request to strike portions of Plaintiff's response in excess of the 10 page limit.

affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324. If the non-moving party fails to make a sufficient showing of an element of its case, the moving party is entitled to judgment as a matter of law. Id. at 325. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). In making this determination, the court must "view[] the evidence in the light most favorable to the nonmoving party." Fontana v. Haskin, 262 F.3d 871, 876 (9th Cir. 2001). The Court does not engage in credibility determinations, weighing of evidence, or drawing of legitimate inferences from the facts; these functions are for the trier of fact. Anderson, 477 U.S. at 255.

II.     **First Cause of Action: Discrimination in Violation of California Government Code section 12940**

Under California's Fair Employment and Housing Act ("FEHA"), "[i]t is unlawful employment practice . . . (a) [f]or an employer because of the . . . physical disability . . . age . . . of any person . . . to discharge the person from employment . . . or to discriminate against the person in compensation . . . ." Cal. Gov't Code § 12940(a). California courts have adopted the three-stage burden-shifting test established by the United States Supreme Court for discrimination claims. Guz v. Bechtel Nat'l, Inc., 24 Cal. 4th 317, 354 (2000) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)). The plaintiff has the burden of establishing "(1) he was a member of a protected class, (2) he was qualified for the position he sought or was performing competently in the position he held, (3) he suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory motive." Id. at 355. Once the employee satisfies this burden, there is a presumption of discrimination, and the burden then shifts to the employer to show that its action was motivated by legitimate nondiscriminatory reasons. Id. at 355-56. If the employer meets this burden, the employee must then show that the employer's reasons are pretexts for discrimination, or produce other evidence of intentional discrimination. Id. at 356.

The McDonnell Douglas test was originally developed for use at trial and not in summary

1   judgment; therefore, in the summary judgment context, "'[a]lthough the burden of proof in a

2   [discrimination] action claiming an unjustifiable [termination] ultimately rests with the plaintiff . . .,

3   in the case of a motion for summary judgment . . . , the burden rests with the moving party to negate

4   the plaintiff's right to prevail on a particular issue . . . .'"  Arteaga v. Brink's, Inc., 163 Cal. App. 4th

5   327, 343-344 (2008) (citation omitted).

6      **A.**  **Disability Discrimination**

7     In the first cause of action, Plaintiff presents a claim of disability discrimination.  Plaintiff

8   must show evidence that demonstrates, even circumstantially or by inference, that (1) he suffers

9   from

10    a disability; (2) he could perform the essential duties of the job with or without reasonable

11   accommodations, and (3) was subjected to an adverse employment action because of the disability

12   or perceived disability.  Sandell v. Taylor-Listug, Inc., 188 Cal. App. 4th 297, 310 (2010).

13     Defendant argues that Plaintiff cannot prove the third factor that he was subject to an adverse

14   employment action because of his disability.  Plaintiff contends that through a series of actions, he

15   was subject to disability discrimination.  Plaintiff also argues that Defendant has failed to establish a

16   legitimate non-discriminatory reason for his termination.

17     An employee's subjective belief that he suffered an adverse employment action as a result of

18   discrimination is not enough to survive a summary judgment motion.  Douglass v. United Services

19   Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996).  "A plaintiff may not create a genuine issue of

20   material fact by relying solely on the Plaintiff's subjective belief that the challenged employment

21   action was unnecessary or unwarranted."  Cornwell. v. Electra Cent. Credit Union, 439 F.3d 1018,

22   1029 n. 6 (9th Cir. 2006).  A subjective belief that one is fired for discriminatory reasons is not

23   sufficient to establish a prima facie case.  McMillian v. Svetanoff, 878 F.2d 186, 190 (7th Cir.

24   1989).    In McMillian, the plaintiff, a black woman, was a court reporter and the defendant,

25   was a judge who was in private practice at the time of the alleged discriminatory act.  Id.  The judge

26   asked plaintiff a question in the courtroom.  Id.  Plaintiff claims that she gave the judge an answer

27   but not trusting her answer, he then asked a white bailiff who was present in the courtroom the same

28   question.  Id.  The court concluded that plaintiff's subjective belief that the judge was racially biased

1    was insufficient to create a genuine issue of material fact.  Id.

2           On or about September 6, 2007, Plaintiff got into a shouting match with a co-worker, Mike

3    Dumont, at the Sky Ranch jobsite.  (PNOL, Ex. 3, Pl's Depo. at 270:7-271:23.)  According to one

4    witness, Plaintiff "began to raise his voice . . . Mike Dumont drove up as land super (Plaintiff) was

5    yelling . . not at anytime was land super willing to work as a team to solve the issue.  He just

6    continued with his verbal assault of curse words and at one time threatened Mike Dumont to get out

7    of his truck and he land super was going to kick his fucking ass and he was a pussy for not getting

8    out and rolling up his windows and locking his door. . . . Not at any time was Mike Dumont

9    aggressive nor combative his actions to not pursue confrontation physical or verbal was very

10   professional."  (Garraffo Decl. ¶ 7, Ex. C [J. Ennis].)  Another eyewitness stated that when Mike

11   Dumont pulled up in his car,  "Gary abruptly told Mike Dumont to leave immidiately (sic) before he

12   "Gary" kicked his ass.  Profanities were included by Gary."  (Id., [C. Nelson].)   Mike Dumont also

13   stated that while moving his vehicle, he noticed Plaintiff and Jay Ennis having a heated discussion.

14   He wrote, "I asked what was wrong, at that time Gary M. demanded I leave as he got out of his truck

15   he told me he was going to kick my ass.  As I locked my vehicle door and rolled up my window he

16   said he would find me one day off the jobsite to watchout."  (Id., [M. Dumont].)

17          Plaintiff testified that when he was having a dispute with one of the subcontractors about

18   moving a truck, Mike Dumont drove up and without knowing the situation, starting yelling at

19   Plaintiff.  (PNOL, Ex. 3, Pl's Depo. at 272:7-273:7.)  Plaintiff admitted he "lost a little bit of control

20   on that" because of his medicine and "wasn't thinking straight."  (Id. at 273:8-23.)  Plaintiff testified

21   that he does not recall or remember what he said   (Id. at 273:12-274:25.)

22          Because of the incident and its policy prohibiting workplace violence, Defendant decided to

23   terminate Plaintiff's employment.  (Garraffo Decl., ¶ 9; Ex. E.)  However, the decision was reversed

24   when Plaintiff presented Lennar with a doctor's note which stated that Plaintiff had diabetes and

25   high or low blood sugar could cause him to behave irrationally.  (Pusateri Decl., Ex. G; PNOL, Ex.

26   3, Pl's Depo. at 270:7-278:7)  Plaintiff stated he had been off his medication and then had trouble

27   readjusting his blood sugar when he went back on the medication.  (Id. at 277:16-278:18.)  Plaintiff

28   signed the Counseling Report Notice issued to Plaintiff for his misconduct.  (Id., Ex. H.)

Plaintiff testified that the work environment changed after the incident and he was treated unfairly and lost favor in the company.  (PNOL, Ex. 3, Pl's Depo. at 280:4-8; 282:22-25.)  Mike Levesque, the Division President, personally ordered Plaintiff to apologize to Mike Dumont in an e-mail and carbon copy everybody involved.  (Id. at 281:10-16.)   He was also required to apologize to the subcontractors that were there during the incident.  (Id. at 289:15-18.)  Plaintiff testified that he would have apologized to Mike Dumont on his own but the apology was "basically rammed down my throat."  (Id. at 280:20-22.)  Plaintiff stated that he felt that they were persecuting him for something he did not have control over.  (Id. at 281:17-20.)  Plaintiff had a good relationship with Levesque before the incident; however, after the altercation, Levesque would not return his voicemail messages, and ignored him at the office.  (Id. at 283:1-2; 14-18.)  Mark Porter also had a "more hands-off attitude towards me.  After that, he wasn't communicating with me as well."  (Id. at 283:3-5.)  Plaintiff states he was never asked to present his side of the story.  (Id. at 284:16-17.)  Plaintiff claims that the change in attitude was a result of the incident which was caused by his medical condition.  (Id. at 283:20-23.)  Plaintiff acknowledged that if he had not provided a doctor's note, his employment would have been terminated.  (Id. at 284:7-10.)

Plaintiff stated that nobody at Lennar told him he was being laid off because of his medical condition.  (Id. at 288:2-5.)  As to his congestive heart condition, Mark Porter knew about it because they had casual conversations about it.  (Id. at 290:5-24.)  Plaintiff does not recall when the conversation about his heart took place.  (Id. at 290:17-21.)  Nobody at Lennar asked him about any medical issues.  (Id. at 291:20-22.)  He never told anyone at the human resources department about his medical condition.  (Id. at 292:5-7.)  He did not inform Mike Levasque about his heart condition. (Id. at 291:13-15.)

In summary, Plaintiff argues he was terminated as a result of the incident in September 2007 because he was not getting phone calls returned, people were treating him differently and he was forced to write an apology e-mail to everyone involved.  (Id. at 289:3-18.)  The Court concludes that the reasons Plaintiff believes that he was terminated because of his disability are subjective. Plaintiff's perception that the environment changed after the incident involving his diabetes does not present a prima facie case of disability discrimination because he has not shown that the reason

Plaintiff was terminated was due to his disability.  The Court also notes that Defendant reversed its decision to terminate Plaintiff when he presented a doctor's note explaining his behavior.  Therefore, Defendant was sympathetic to Plaintiff's diabetic condition and did not terminate him at the time of the incident which was caused by his medical condition.

In addition, Defendant contends that termination eight months after the altercation is too long to suggest causation.  Plaintiff does not need to prove a causal connection between the disability and the adverse employment action by direct evidence.  Jenkins v. Wells Fargo Bank, 85 Cal. App. 4th 245, 254  (2000).  "'The causal link may be established by an inference derived from circumstantial evidence, such as . . . proximity in time between the protected action and the allegedly retaliatory employment . . . .'"  Fisher v. San Pedro Peninsula Hospital, 214 Cal. App. 3d 590, 615 (1989) (quoting Jordan v. Clark, 847 F.2d 1368, 1376 (9th Cir. 1988)).  As to cases in retaliation claims, in some cases, "causation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity."  Villiarimo v. Aloha Island Air., Inc., 281 F.3d 1054, 1065 (9th Cir. 2002).  But timing alone will not show causation in all cases; rather, "in order to support an inference of retaliatory motive, the termination must have occurred 'fairly soon after the employee's protected expression.'"  Paluck v. Gooding Rubber Co., 221 F.3d 1003, 1009-10 (7th Cir. 2000); see also Filipovic v. K & R Express Sys., Inc., 176 F.3d 390, 398-99 (7th Cir. 1999) (four months too long to show causation); Adusumilli v. City of Chicago, 164 F.3d 353, 363 (7th Cir. 1998) (eight months too long to show causation), cert. denied, 528 U.S. 988 (1999); Davidson v. Midelfort Clinic, Ltd., 133 F.3d 499, 511 (7th Cir. 1998) (five months too long to show causation); Conner v. Schnuck Markets, Inc., 121 F.3d 1390, 1395 (10th Cir. 1997) (four months too long to show causation.)

Here, Plaintiff was terminated eight months after the altercation with Mike Dumont.  Based on the caselaw, eight months is far removed from the time of the incident to create an inference of causation that Plaintiff's termination was due to the to the altercation which was caused by his medical condition.  The Court concludes that Defendant has shown that Plaintiff has failed to present a prima facie case of disability discrimination as to the third factor regarding causation.

Furthermore, Defendant has provided a legitimate nondiscriminatory reason for terminating

Plaintiff.  Defendant states that Plaintiff's employment was terminated in May 2008 as part of an ongoing reduction in force within the division.  (Garraffo Decl. ¶ 10.)  Since 2006, Lennar has been engaged in reorganizing its business units in California which resulted in multiple rounds of reductions in force.  (Id.)  Starting November 2006 until 2008, the San Diego Division of Lennar began downsizing.  (Pusateri Decl., Ex. I, Porter Depo. at 38:22-23.)  Lennar also consolidated its business units by dissolving the San Diego Division into the California Coastal Division located in Orange County in September or November 2008.  (Id. at 15:24-16:20.)

During this time, employees of Lennar were laid off due to a reduction in force caused by the economic downturn.  Farley, vice president of land acquisition, was laid off at the time the San Diego Division was being consolidated into the coastal division in the fall of 2008.  (Pusateri Decl. Ex. I, Porter Depo. at 15:10-12; 15:16-16:3.)  Paul Munoz, who was area manager for the Lakes, was laid off as part of the reduction in force.  (PNOL, Ex. 4, Porter Depo. at 27:25-28:10.)  Rob Damaro, a senior project manager who was involved in the discussions regarding hiring Plaintiff, left the company in the middle of 2007 as part of the downsizing.  (Id. at 66:14-67:25.)  Brett Rabina, an assistant area manager at the Lakes, was laid off due to the downsizing in November of 2007 or 2008.  (Id. at 38:3-22.)

At the time of Plaintiff's termination, there were three remaining active communities in San Diego: Sky Ranch, The Lakes and Eureka Springs.  (Pusateri Decl., Ex. I, Porter Depo. at 17:19-25.)  Plaintiff was responsible for Eureka Springs and Sky Ranch.  (Id. at 31:22-24.)  From an off-site horizontal construction perspective, Sky Ranch was 80% complete, the Lakes was 75-80% complete and Eureka Springs had been completed.  (Id. at 45:15-19; 47:6-13; 47:14-17.)  The remaining 20% of work at Sky Ranch did not have to be coordinated by an area manager.  (PNOL, Ex. 8, Farley Depo. at 30:15-20.)  Lennar also had no immediate plans to develop future housing developments in the San Diego area.  (Id. at 38:11-14.)

Based on the downturn of the economy and the housing market, Defendant was forced to downsize its company.  Defendant has provided a legitimate, non-discriminatory reason for Plaintiff's termination.  In response, Plaintiff has not shown that Lennar's reason for the termination is a pretext for discrimination and has not provided other evidence of intentional discrimination.  See

1   Guz, 24 Cal. 4th at 356.

2       Plaintiff has failed to present a prima facie case for disability discrimination by failing to

3   show he was terminated because of his disability.  In addition, Defendant has provided a legitimate,

4   nondiscriminatory reasons for terminating Plaintiff.  Therefore, the Court concludes that there are no

5   genuine issue as to any material fact as to the claim for disability discrimination.  Accordingly, the

6   Court GRANTS Defendant's motion for summary judgment as to the claim for disability

7   discrimination under California Government Code section 12940.

8       **B.     Age Discrimination**

9       In the first cause of action, Plaintiff also alleges a claim of age discrimination.  (Dkt. No. 8 at

10  4.)  To establish a prima facie case of age discrimination under FEHA, a plaintiff must show he was

11  (1) a member of a protected class, that is, age 40-70; (2) performing his job in a satisfactory manner;

12  (3) discharged; and (4) replaced by a substantially younger employee with equal or inferior

13  qualifications."  Nidds v. Schindler Elevator Corp., 113 F.3d 912, 917 (9th Cir. 1996), cert denied,

14  522 U.S. 950.  "California courts interpreting FEHA look to federal cases interpreting the Age

15  Discrimination in Employment Act . . . and Title VII of the Civil Rights Act . . . ."  Id. at 916.  There

16  is flexibility as to the fourth element where the discharge results from a general reduction in the

17  work force due to business conditions so "failure to prove replacement by a younger employee" is

18  not fatal to an age discrimination claim.  Rose v. Wells Fargo & Co., 902 F.2d 1417, 1421 (9th Cir.

19  1990); Guz, 24 Cal. 4th at 366.  The courts "require instead that the plaintiff show through

20  circumstantial, statistical, or direct evidence that the discharge occurred under circumstances giving

21  rise to an inference of age discrimination."  Rose, 902 F.2d at 1421.  This inference "can be

22  established by showing the employer had a continuing need for his skills and services in that his

23  various duties were still being performed."  Wallis v. J.R. Simplot Co., 26 F.3d 885, 891 (9th Cir.

24  1994) (quotation omitted).  The inference can also be established by demonstrating "that others not

25  in her protected class were treated more favorably."  Washington v. Garrett, 10 F.3d 1431, 1434 (9th

26  Cir. 1992).

27      Defendant argues that Plaintiff cannot show the fourth element of his age discrimination

28  claim that he was replaced by a substantially younger employee with equal or inferior qualifications.

1    According to Defendant, Plaintiff's duties were transferred to Mark Porter.  (Pusateri Decl., Ex. I,

2    Porter Depo. at 31:14-21; Ex. J, Farley Depo. at 36:17-19.)  At the time, Porter was about 53 years

3    old which is about the same age as Plaintiff when he was laid off.  (Id., Ex. A, Pl. Depo. at 13:7-8;

4    Ex. I., Porter Depo. at 8:23-24.)  He became the only area manager for the San Diego division.  (Id.

5    at 32:5-6.)  Jamie Hernandez, the assistant area manager, who worked under Plaintiff continued in

6    the same position after Plaintiff left.  (PNOL, Ex. 4, Porter Depo. at 37:4-13.)  Porter became

7    Hernandez' immediate supervisor.  (Id. at 37:22-24.)

8         Defendant also presents a legitimate, non-discriminatory reason for Plaintiff's termination.

9    Defendant states that Plaintiff's employment was terminated in May 2008 as part of an ongoing

10   reduction in force within his division.  Starting November 2006 until 2008, the San Diego Division

11   began downsizing.  (Pusateri Decl., Ex. I, Porter Depo. at 38:22-23.)  Lennar also consolidated its

12   business units by dissolving the San Diego Division into the California Coastal Division located in

13   Orange County in September or November 2008.  (Id. at 15:24-16:20.)

14        The three remaining active communities in San Diego was the Sky Ranch, The Lakes and

15   Eureka Springs.  (Id. at 17:19-25.)  Plaintiff was responsible for the Eureka Springs and Sky Ranch

16   communities.  (Id. at 31:22-24.)  At the time that Plaintiff's employment was terminated, from a

17   horizontal construction perspective, Sky Ranch was 80% complete, the Lakes was 75-80%

18   complete, and the horizontal construction on Eureka Springs had been completed.  (Putaseri Decl.,

19   Ex. I, Porter Depo., 45:15-19, 47:6-13, 47:14-17.)  Farley testified that there were still

20   subcontractors at Sky Ranch when Plaintiff was laid off and that the coordination of the

21   subcontractors did not necessarily have to be coordinated by an area manager.  (PNOL, Ex. 8, Farley

22   Depo. at 30:15-20.)  In addition, there were no plans for future housing developments in the San

23   Diego area.  (Pusateri Decl., Ex I, Porter Depo. at 28:11-14; Ex. J, Farley Depo. at 29:4-8.)

24        In opposition, Plaintiff argues that when he was fired, Jaime Hernandez, the assistant area

25   manager at Sky Ranch became the *de facto* area manager.  (PNOL, Ex. 5, Hernandez Depo. at 6:17-

26   25; 86:7-87:20.)  Hernandez was 36 years old when Plaintiff was terminated and testified that he is

27   basically performing the work of an area manager.  (Id. at 103:19-20.)

28        When Plaintiff left, there were two remaining projects, the Lakes and Sky Ranch.  (PNOL,

Ex. 4., Porter Depo. at 96:11-19.)  The Sky Ranch development was the only development that had an assistant area manager.  (<u>Id.</u> at 96:24-97:6.)  Porter split his time on the two communities based on demand.  (<u>Id.</u> at 96:17-19.)  When he was not at Sky Ranch, Hernandez, the assistant area manager at Sky Ranch, would act like an area manager at Sky Ranch and the subcontractors would go to him for direction.  (<u>Id.</u> at 97:7-18.)

There is a disputed issue of material fact as to whether Porter, who was 53 years old or Hernandez, who was 36 years old, took over Plaintiff's duties when Plaintiff was terminated.  Even though Porter, in name, may have retained Plaintiff's job title, Hernandez, the assistant area manager, without a change in title or increase in pay, may have taken over the actual responsibilities of Plaintiff's duties.

Furthermore, there is a genuine issue of material fact as to whether Farley, the vice president of land acquisition, made a direct discriminatory remark regarding age to Plaintiff when he was terminated.  Around May 15, 2008, Farley telephoned Plaintiff and informed him that he was being laid off.  According to Plaintiff, Farley said, "Hey, I just want to let you know that they're gonna lay you off tomorrow."  When Garry asked him why, Farley responded: "There's a lot of reasons . . . We're going to have Jamie take over ."  Garry said, "My job's still going.  You know, everything is still moving on the job.  Why is that?"  Farley answered, "Well, he's half your age and half your wages."  (PNOL, Ex.3, Pl's Depo. at 249:19-250:20.)   If Farley, the vice president of land acquisition, made such a statement, that would constitute direct evidence of a discriminatory motive in terminating Plaintiff because of his age.

At his deposition, Farley denies having told Plaintiff that Lennar was keeping Hernandez because he was half of Plaintiff's age or pay.  (Pusateri Decl., Ex. J, Farley Depo. at 35:12-24.)  Farley stated that he could not imagine Plaintiff asking him about keeping Hernandez because Hernandez had an entirely different position and role than Plaintiff.  (PNOL, Ex. 8, Farley Depo. at 36:2-9.)  Farley stated that the Hernandez' position as assistant area manager and Plaintiff's position as area manager cannot be compared because Defendant would not have considered Hernandez for that type of management role.  (<u>Id.</u> at 32:2-12.)   Instead, the consideration would have been between terminating Plaintiff or Mark Porter who were both in management positions.  (<u>Id.</u>)  He stated that

1   Jaime Hernandez did not replace Plaintiff when he was terminated; Hernandez remained an assistant

2   area manager.  (Id. at 31:24-32:4.)

3          In addition, the parties dispute whether Farley, as vice president of land acquisition, had the

4   authority to terminate Plaintiff's employment and whether the direct discriminatory comment he

5   made is a statement made on behalf of the company.  Defendant claims Farley did not have authority

6   to terminate Plaintiff's employment while Plaintiff states Farley did have the authority.  Initially,

7   Farley testified that he had input on the layoffs.  (Id. at 30:21-23.)  Then he testified that he was told

8   by Mike Levesque that one position needed to be eliminated.  (Id. at 31:1-23.)  Farley merely

9   informed Plaintiff that he would be part of a layoff happening in the division.  (Id. at 33:5-12.)  He

10  stated that Mike Levesque made the decision to terminate Plaintiff and he was not the ultimate

11  decision maker on Plaintiff's termination.  (Id. at 34:9-14.)

12         Therefore, there is a material factual issue in dispute as to whether Hernandez or Porter

13  actually took over Plaintiff's job duties as area manager; whether Farley, a person in management,

14  had the authority to terminate Plaintiff and if so, whether Farley, as a decision maker, made a direct

15  discriminatory statement stating that Plaintiff was being replaced by Hernandez because he was

16  younger and cheaper.  Accordingly, the Court DENIES Defendant's motion for summary judgment

17  as to the age discrimination claim.

18  **III.    Second Cause of Action:  Wrongful Termination in Violation of Public Policy**

19         In the second cause of action, Plaintiff alleges that Defendant termination of Plaintiff's

20  employment arbitrarily in order to avoid paying him earned bonus compensation in excess of

21  $20,000, which represents his earned 25% performance bonus, is a violation of the public policy of

22  the State.[3]

23         In California, an at will employment is terminable by either party at will, on giving the other

24  party reasonable notice.  Green v. Ralee Eng'g Co., 19 Cal. 4th 66, 75 (1998).  An exception to this

25  rule is where an employee is discharged for performing an act that public policy would encourage,

---

[3]In its motion for summary judgment, Defendant construes this cause of action as a breach of employment contract claim.  However, the First Amended Complaint states that the claim that he did not receive his bonus compensation falls under the second cause of action under wrongful termination in violation of public policy.  Plaintiff's claim for breach of contract concerns solely the alleged overtime unpaid wages he seeks.

or for refusing to do something public policy would condemn.  Tameny v. Atlantic Richfield Co., 27

Cal. 3d 167, 176 (1980); Nelson v. United Techs., 74 Cal. App. 4th 597, 608 (1999).  "The

availability of the tort helps prevent employers from using the threat of termination to coerce

employees into committing crimes, concealing wrongful acts, or engaging in other conduct harmful

to the public welfare."  Nelson, 74 Cal. App. 4th at 608.

A plaintiff alleging wrongful termination in violation of public policy must allege conduct

that violates a public policy delineated in a constitutional or statutory provision.  Green, 19 Cal. 4th

at 79; Gantt v. Sentry Ins., 1 Cal. 4th 1083, 1094-95 (1992), overruled in part on other grounds in

Green, 19 Cal. 4th at 80 n.6; Sequoia Ins. Co. v. Superior Court, 13 Cal. App. 4th 1472, 1480

(1993).  In Gantt, the California Supreme Court explained that "courts in wrongful discharge actions

may not declare public policy without a basis in either the constitution or statutory provisions.  A

public policy exception carefully tethered to fundamental policies that are delineated in

constitutional or statutory provisions strikes the proper balance among the interests of employers,

employees, and the public."  Gantt, 1 Cal. 4th at 1095 (emphasis removed).  In 1998, the California

Supreme Court held that administrative regulations can also be a source of public policy for claims

of wrongful discharge in violation of public policy.  Green, 19 Cal. 4th at 79-82.  Assuming there is

an applicable statute, constitutional provision, or administrative regulation, public policy wrongful

discharge cases usually involve four categories:  "(1) refusal to violate a statute; (2) performing an

obligation imposed by statute; (3) exercising a statutory privilege or right; and (4) reporting an

alleged violation of a statute of public importance."  Nelson, 74 Cal. App. 4th at 608; Gantt, 1 Cal.

4th at 1090-91.  However, an action is not strictly limited to these situations but will lie "wherever

the basis of the discharge contravenes a fundamental public policy."  Gould v. Maryland Sound

Indus., Inc., 31 Cal. App. 4th 1137, 1147 (1995) (quotation omitted).

In California, it is established in statute that the "prompt payment of wages due an employee

is a fundamental public policy of this state."  Id. at 1147; see Cal. Labor Code § 201 ("If an

employer discharges an employee, the wages earned and unpaid at the time of discharge are due and

payable immediately."); Cal. Labor Code § 216 (any employer , "[h]aving the ability to pay,

willfully refuses to pay wages due and payable after demand has been made" is guilty of a

1   misdemeanor.)  Therefore, failure to pay an employee compensation that is due is a fundamental

2   public policy.

3       Plaintiff claims that Mark Porter, who interviewed Plaintiff for the position, orally agree at

4   the time he was hired, that Plaintiff would be paid a 25% bonus compensation.  Preliminarily, the

5   Court needs to determine whether Mark Porter, the Operations Manager, who interviewed Plaintiff

6   had the ostensible authority to bind Defendant to an alleged oral contract approving a 25% bonus

7   compensation to Plaintiff.

8       An agency is created when the principal gives actual or ostensible authority to act on the

9   principal's behalf.  Cal. Civ. Code §§ 2316, 2317.  An agent "has the power to bind his principal

10  only if he has actual or apparent authority to do so."  Hawaiian Paradise Park Corp. v. Friendly

11  Broad, Co., 414 F.2d 750, 755 (9th Cir. 1969).  An agent only "has such authority as the principal,

12  actually or ostensibly, confers upon him."  Cal. Civ. Code § 2315.

13      Ostensible authority is the authority of the agent which the principal causes or allows a third

14  person to believe that the agent possesses.  Cal. Civ. Code § 2317.  "[O]stensible authority arises as

15  a result of conduct of the principal which causes the third party reasonably to believe that the agent

16  possesses the authority to act on the principal's behalf."  Chicago Title Inc. Co. v. AMZ Ins. Srvs.,

17  Inc., 188 Cal. App. 4th 401, 426 (2010) (quoting Tomerlin v. Canadian Indemnity Co., 61 Cal. 2d

18  638, 643 (1964).  "[O]stensible authority must be based upon the acts of the principal and not the

19  conduct or representation of the alleged agent."  South Sacramento Drayage Co. v. Campbell Soup

20  Co., 220 Cal. App. 2d 851 (1963.)  Ostensible authority can be proven by showing that the

21  "principal approved prior similar acts of the agent."  Chicago Title Inc.,Co., 188 Cal. App. 4th at

22  426 (citation omitted).

23      Defendant argues that Porter had no authority to make a binding contract concerning

24  Plaintiff's bonus compensation.  Porter stated that he had no authority from the company to offer

25  Plaintiff a job but he was involved in the decision to hire him by making recommendations.

26  (Pusateri Reply Decl., Ex. M, Porter's Depo. at53:14-56:11.)  He also testified that he probably

27  discussed compensation informing Plaintiff the upper range of the salary but he did not have

28  authority to offer more money than what Lennar was offering. (Id. at 53:7-13; 57:10-16.)  Porter

1   denies having offered Plaintiff a 25% performance bonus.  (Id. at 57:25-58:6.)  The ultimate decision

2   to hire Plaintiff came from human resources and ultimately Pete Fagrell.  (Id. at 58:8-23.)  Porter

3   testified that bonus decisions were corporate driven and "I didn't have anything to do with who got

4   what or when." (PNOL, Ex. 4, Porter Depo. at 80:17-22.)  Also, the compensation was "pretty much

5   set" whereby everybody involved has a part of the bonus program that is pretty well designed.

6   (PSNOL, Ex. 3, Porter Depo. at 51:21-52:6.)  Since it's a big corporation, "they don't have a lot of

7   leeway in the bonus programs or salary programs, car allowance."  (Id. at 52:4-5.)

8       In opposition, Plaintiff argues that Porter had actual and apparent authority to make an oral

9   contract regarding a bonus because Porter was the only person who interviewed Plaintiff.  Without

10  legal or factual support, Plaintiff summarily argues that Lennar intentionally or negligently led

11  Plaintiff to believe that Porter had the authority to bind the corporation and that the corporation had

12  agreed to the deal that Porter recommended.

13      Accordingly to Plaintiff, he was interviewed by Mark Porter, the Operations Manger in the

14  San Diego Division.  (PNOL, Ex. 3, Pl's Depo. at 63:14-22.)  During the interview, Plaintiff states

15  they discussed his compensation.  (Id. at 67:8- 21.)  Porter told him that he would get a $95,000 base

16  salary plus a 25% bonus compensation if the goals of on-time, on-budget, quality product were met.

17  (Id. at 67:22-68:14; 65:12-66:19; 93:4-12.)  Plaintiff admits that Porter told him that Porter had the

18  authority to negotiate but that final approval had to come from Pete Fagrell, Vice President of the

19  Land Division.  (Id. at 68:16-69:4.)  Once Porter got final authority to approve the 25% incentive

20  compensation, Plaintiff claims Porter had the authority to tell Plaintiff that the compensation

21  package had been approved.  (Id. at 248:22-249:9.)  Plaintiff was notified by the recruiting firm that

22  Defendant was offering him the job on the terms negotiated with Porter.  (Id. at 71:5-18.)  Plaintiff

23  states that he never spoke with Fagrell prior to being hired by Lennar.  (Id. at 68:19-21.)  Plaintiff

24  only spoke with Mark Porter about the specific terms of the oral bonus compensation and only

25  discussed it with Porter after he was employed by Defendant.  (Id. at 65:12-70:4; 85:4-16; 86:21-24;

26  88:5-16; 92:24-93:3.)

27      Based on the evidence, Plaintiff has not shown that, through the conduct of Defendant, Porter

28  had ostensible authority to bind Lennar to an oral agreement allegedly made with Plaintiff about a

1   25% bonus compensation.  The facts reveal that Porter had interviewing and hiring duties, but he did

2   not have ostensible authority to make any employment or bonus offers.  The fact that Porter was the

3   only employee of Lennar that interviewed Plaintiff is not conduct by Defendant which should cause

4   Plaintiff to reasonably believe that Porter had the authority to bind Defendant to a bonus

5   compensation.  Plaintiff knew that Porter did not have final authority to hire Plaintiff or set

6   compensation at the interview; Porter did not orally or in writing confirm that Lennar had given him

7   the authority to approve the compensation package; and Plaintiff heard he was hired and told about

8   his compensation through the recruiter.  Therefore, it was not reasonable for Plaintiff to believe that

9   Porter possessed the authority to act on behalf of Lennar.  Accordingly, there is no disputed issue of

10  material fact that Lennar did not grant Porter ostensible authority to approve a 25% bonus

11  compensation to Plaintiff.

12          In addition, it was not reasonable for Plaintiff to rely on Porter because the oral bonus

13  agreement directly contradicted the terms of Plaintiff's Offer Letter and the Target Bonus

14  Opportunity plan documents he signed for three years.  Plaintiff never raised the issue or questioned

15  the bonus compensation to Porter's superiors or made any inquiry as to Porter's authority to make

16  the alleged oral contract.

17          Because Porter did not have ostensible authority to bind Lennar to an alleged oral contract

18  regarding a 25% bonus compensation, the Court need not address whether Plaintiff was entitled to a

19  performance bonus based on the oral agreement.  Accordingly, the Court GRANTS Defendant's

20  motion for summary judgment as to the claim of wrongful termination in violation of public policy

21  as to the earned 25% performance bonus.

22  **IV.    Third Cause of Action:  Breach of Contract**

23          **A.    Failure to Pay Overtime Compensation**

24          Plaintiff argues that he is entitled to overtime compensation for all hours worked in excess of

25  40 hours per week under California Labor Code section 1194 and the Federal Fair Labor Standards

26  Act.

27          Under the Fair Labor Standards Act, 29 U.S.C. §§ 201-219 and under California's Labor

28  Code sections 510 and 515, a plaintiff is entitled to overtime pay for his work for a defendant unless

the defendant demonstrate the Plaintiff's work is exempt.  29 U.S.C. §§ 201-219; Cal. Labor Code § 510(a).  "Because the California wage and hour laws are modeled to some extent on federal laws," federal cases can provide persuasive guidance."  Nordquist v. McGraw-Hill Broadcasting Co., 32 Cal. App. 4th 555, 562 (1995).  The burden is on the employer to establish that the employees in question qualify for an exemption to that requirement under both federal and state law.  Conley v. Pacific Gas & Electric Co., 131 Cal. App. 4th 260, 266 (2005).

An employer is exempt from FLSA's overtime requirement if the employee is "employed in a bona fide executive, administrative, or professional capacity."  29 U.S.C. § 213(a)(1).  Whether an employee is exempt from the requirements of the FLSA is primarily a question of fact.  Nigg v. U.S. Postal Service, 555 F.3d 781, 788 (9th Cir. 2009) (citation omitted).

An employee is in a "bona fide administrative capacity" if he is paid no less than $455 per week", "[w]hose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers," and "whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance."  29 C.F.R. § 541.200(a).

### 1.    Salary Requirement

Under federal law, Plaintiff must earn no less than $455 per week.  29 C.F.R. § 541.200(a). Plaintiff received $7,917.00 per month.  (Garraffo Decl. ¶ 4.)  Therefore, the salary requirement has been met and is not disputed by the parties.

### 2.    Primary Duty is Work Related to the Management or General Business Operations of the Employer or its Customers

An employee's primary duties must be the "performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers."  29 C.F.R. § 541.200(a).  An employee's duties that are "directly related to management or general business operations" refer to the type of work performed by the employee.  To meet this requirement, "an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment."  29 C.F.R. § 541.201(a).

> Work directly related to management or general business operations includes, but is not limited to, work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations, government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities.

29 C.F.R. § 541.201(b).  Primary duties generally occupy more than 50% of the employee's work time.  Nordquist v. McGraw-Hill Broadcasting Co., 32 Cal. App. 555, 563 (1995).

In Gottlieb v. Const. Srvs. & Consultants, Inc., 2006 WL 5503644 (S.D. Fl. 2006), the court held that Plaintiff, as project supervisor for a company engaged in the business of constructing shells for houses, was not an exempt employee.  Id. at 8.  The business involved the use of subcontractors for every phase and the project supervisors' job was to schedule the subcontractors, order supplies, bill on his construction site, be the company's representative on the construction site and inspect the work of the subcontractors.  Id. at 2.  Plaintiff was not responsible for hiring or interviewing subcontractors and the area manager was generally present on the construction site each a time a new model was built and made any changes to the quantity of supplies needed.  Id.  If the area manager was not present, Plaintiff was expected to make these changes.  Id.  Plaintiff was also responsible for the safety on the construction site.  Id. at 3.  The court explained that Plaintiff's work was "producing the product existed to market rather than servicing itself."  Id. at 6.  Plaintiff worked on the production end of the employer in ensuring the shells were built in a timely manner.  Id.  Therefore, his primary work was not directly related to the management or general business operations of the employer or the employer's customers.

In Cotton v. HFS-USA, Inc., the Court held that the plaintiff was not an administrative employee.  Cotten v. HFS-USA, Inc., 620 F. Supp.2d 1342 (M.D. Fl. 2009).  Plaintiff was a Field Supervisor for Defendant, a provider of home finishing services, such as installation of tile and hardwood flooring, carpet, decorative trim and molding, and exterior stone and pavers to residential builders.  Id. at 1344.  Although Plaintiff managed certain assigned installation sites, his duties were to ensure "the installers received their work orders, retried the correct materials from the warehouse and completed the installation job as specified in the contract and the work order and in compliance

1   with specified standards." <u>Id.</u>  He was not responsible for negotiating or executing contracts,

2   creating work orders or developing the applicable standards; did not perform duties related to

3   financing, budgeting, accounting, auditing, research, employee benefits, taxes, insurance, advertising

4   or computer technology; and was not involved in formulating business policies or procedure.  <u>Id.</u>

5   The court concluded that Plaintiff's primary duties were not directly related to the management or

6   general business operations of Defendant.  <u>Id.</u>

7       In <u>Black v. Colaska, Inc.</u>, Plaintiff was a project manager for Secon, a construction company

8   that was responsible for large projects in Juneau, Alaska.  <u>Black v. Colaska, Inc.</u>, 2008 WL 4681567

9   (W.D. Wa. 2008).  The court held that Plaintiff was an administrative employee.  <u>Id.</u> at 9.  The court

10  concluded that even though Plaintiff performed substantial physical labor, his primary duty was the

11  performance of office or non-manual work directed related to the management or general business

12  operations of the employer or its customers.  <u>Id.</u> at 8-9.  Plaintiff stated he did "whatever it took to

13  get the jobs done; all aspects, anything and everything that needed to get the job done."  <u>Id.</u> at 9.  His

14  responsibilities included "written and verbal communications with owners about specific projects;

15  signing subcontracts on behalf of Secon; signing change orders; supervising and directing the work

16  of employees at the job-site; determining the number of employees needed at a job site and

17  requesting employees as needed from individuals at Secon; determining the hours worked by the

18  crew; scheduling the work; creating the project schedules . . . ; sequencing the work; along with

19  another employee preparing monthly cost analyses; signing pay estimates; drafting and ensuring

20  compliance with owner required plans . . . purchasing and scheduling materials; and ensuring that

21  projects met specifications."  <u>Id.</u>  The court held that these duties included responsibility for

22  auditing, quality control, purchasing, procurement, safety and health, legal and regulatory

23  compliance as well as personnel management.  <u>Id.</u>

24      In this case, Defendant argues that Plaintiff's duties were directly related to management

25  policies or the general business of his employer. Defendant contends that Plaintiff spent the majority

26  of his day performing high level problem-solving issues that were of substantial importance to

27  Defendant's business operations that could have significant consequences of delaying projects and

28  increasing expenses.

1    At Eureka Springs, Plaintiff came up with the idea to construct a temporary bridge that saved

2    Defendant's money by preventing damage to the streets and reducing the number of loads it would

3    take to move 200,000 tons of dirt.  (Pusateri Decl., Ex. A, Pl's Depo. at 162:6-18; 163:19-21.)  He

4    was also involved in building two permanent bridges.  (Id. at 160:15-16.)  Plaintiff made

5    recommendations on how to handle erosion control at Eureka Ranch because of the Escondido river.

6    (Id. at 154:18-155:5.)  Defendant listened and eventually followed Plaintiff's suggestion about the

7    improper material they should not be using for that project.  (Id. at 166:1-6.)  In addition, Plaintiff

8    made adjustments to the grading plan and managed the scheduling for grading at Eureka Springs

9    after discovering a diesel spillage that cost Lennar $2 million to remediate.  (Id. at 155:5-156:11.)

10   Prior to starting Sky Ranch, Plaintiff was involved in pre-contract meetings.  (Id. at 75:15-

11   17.)  He gave his opinion and suggestions on the logistics, on designs of certain things to make the

12   project easier, less expensive and less time-consuming, and met with engineers about the degree of

13   slopes on the job.  (Id. at 75:18-76:18; 77:3-21.)

14   At Sky Ranch, Defendant had to build a two-million-gallon reservoir and a temporary half-

15   million gallon water reservoir for fire protection before any model homes could open.  (Id. at 186:4-

16   12.)  Plaintiff managed all the subcontractors who were building the reservoir.  (Id. at186:15-18.)

17   Plaintiff coordinated with archaeologists to remove Indian relics at the worksite.  (Id. at 181:13-22.)

18   Plaintiff worked with project management, biologists and the City of Santee to discuss how to

19   handle the gnatcatcher nesting issue at Sky Ranch.  (Id. at 98:7-101:5.)  Plaintiff saved Defendant $5

20   million by coming up with the idea to use forty-foot drop-off bins instead of expensive cable-wire

21   netting costing $5.7 million to stop falling rocks from destroying homes and a school below the Sky

22   Ranch development.  (Id. at 77:22-79:24.)  Sky Ranch was a very complicated project to manage

23   and Plaintiff commented, "Man, I sit here and think, I can't believe I did all that."  (Id. at 186:19-

24   20.)

25   Part of his job as area manager was determining the order and priority of the horizontal

26   construction activities.  (Id. at 102:1-6.)  He led weekly meetings with subcontractors, the erosion

27   control expert and the project manager.  (Id. at 153:10-154:11.)  His job duties also included

28   reviewing the budget which took up 20% of his time.  (Id. at 168:11-15.)  About 10% of his time

was spent interacting and meeting with city officials related to obtaining necessary inspection approvals.  (Id. at 164:18-165:3.)  He approved subcontractors invoices for payment.  (Id. at 240:13-16.)  Plaintiff reviewed change orders, which is any work outside the scope of a subcontractor's contract due to unforeseen circumstances. (Id. at 170:8-172:16.)   Change orders usually included additional costs to be incurred by Defendant.  (Id.)  He attended weekly meetings at the corporate office with his supervisor, Mark Porter, and the assistant area managers to discuss all projects in San Diego.  (Id. at 177:10-178:6.)   Plaintiff stated that most of the time when he made suggestions, "they'd go with what I suggest."  (Id. at 156:10-11.)  Also, he stated, "[t]hey actually listened to me.  They didn't always do that, but I would tell them what to do."  (Id. at 166:4-6.)

        In opposition, Plaintiff argues that he was a blue collar, production employee out in the fields working alongside the "crew."  (PNOL, Ex. 3, Pl's Depo. at 166:21-167:12.)  He states that on Saturday and Sundays, he went to the site to flag, shovel, and sweep.  (Pusateri Decl., Ex. A. Pl's Depo at 119:15-17.)  He had an office in a trailer at the construction sites and not at the corporate office in Carlsbad.  (Id. at 158:10-13.)

        "I spent a lot of time outside with the people and working and doing this.  I was part of the crew, and you get out there and you just —I knew what needed to happen."  (Id. at 167:5-8.)  Every week a meeting would be held and the schedule readjusted and the following week he would implement the new schedule.  (Id. at 167:9-12.)  Plaintiff contends that the several instances where Plaintiff made recommendations for ways to save money or do some tasks were outside the duties of the area manager and did not constitute his primary duties of an area manager.  Plaintiff also claims that he came up with ideas and suggestions but it was up to Lennar's management whether they were going to use it or not.

        Based on Defendant's version of the facts, it could be said that Plaintiff's primary duty was the performance of work directly related to the management or general business operations of Lennar; however, Plaintiff's facts show that his primary duties involved tasks as a production employee out in the field implementing the schedule or duties that were given to him by the corporate office.  There is a disputed issue of material fact as to the primary duties of Plaintiff.  It appears that Plaintiff was well qualified as an area manager, had extensive past experience, and

Defendant appeared to utilize and follow his recommendations on key business operations. However, it is not clear whether his primary work duties involved work directly related to the management or general business operations of Defendant or whether he was a production employee producing Defendant's product.

### 3.    Exercise of Discretion and Independent Judgment with Respect to Matters of Significance

An employee's primary duties must involve "the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.202(a).  To make this determination, the court may look to the following factors:

> whether the employee has authority to formulate affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long-or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

Id. at 541.202(b). In addition, the

> exercise of discretion and independent judgement implies that the employee has authority to make an independent choice, free from immediate direction and supervision.  However, employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level. Thus, the term "discretion and independent judgment" does not require that the decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review. The decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action. The fact that an employee's decision may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean that the employee is not exercising discretion and independent judgment.

29 C.F.R. § 541.202(c).

In Cotten, the court concluded that although Plaintiff had the authority to set prices for

add-ons, minor repairs or warranty work that was not in the original work order, his authority was limited to minor tasks which involved minimal charges. 620 F. Supp.2d at 1351.  Most of the time, Plaintiff received direction from his project manager or operations manager about the price to charge for additional work.  Id.  The court noted that his discretion was so limited that even $50 to $200 repairs submitted by him were "often overruled" by the project manager on the installation.  Id.  In addition, supervisors were on site 20% of the time, and Plaintiff spoke with the operations manager one to three times per day.  Id. at 1353.  The court concluded that Plaintiff's duties did not involve the exercise of discretion and independent judgment with respect to matters of significance.

In Gottlieb, all "matters of significance" were determined by Plaintiff's supervisors.  2006 WL 2203644 at 7.  Plaintiff could not hire new subcontractors or suppliers, could not hire day laborers without approval and could not decide whether to back charge a subcontractor.  Id.  Plaintiff could order supplies, decide when to schedule a governmental inspection and when to schedule subcontractors.  Id.  The court explained that these decisions were based on his skill and experience in the industry and not work involving the "exercise of discretion and independent judgment."  Id.

In Black, the court determined that Plaintiff's primary duty included the exercise of discretion and independent judgment with respect to matters of significance.  2008 WL 4681567 at 9.  Plaintiff was the person on the ground directing crews to complete multi-million dollar contracts which affected Secon's business operations to a substantial degree.  Id.  He was also able to bind the company on significant matters; provided consultation and/or expert advice in helping Defendant to prepare bids; and communicated with project owners on Defendant's behalf.  Id.

Here, Defendant argues that Plaintiff's duties as an area manager required him to regularly exercise discretion and independent judgment on matters of significance on a daily basis.  It claims that Plaintiff provided his opinions on designs of certain things and tried to make things easier, less expensive and less time consuming for Defendant.  (Pusateri Decl., Ex. A, Pl's Depo. at 76:16-18.)  As described above in III.A.2, many of Plaintiff's ideas were implemented at Eureka Springs and Sky Ranch.

In opposition, Plaintiff contends that he worked under the direction of the Operations Manager, the Project Managers and the Division Presidents and Vice Presidents.  (PNOL, Ex. 3, Pl's

Depo. at 94:2-96:2; 102:1-14; 103:3-13.)  He had to be on site when anybody was working there

which meant he worked the same schedule as the hourly workers who worked for the subcontractors.

(Id. at 200:12-201:6.)  He also claims that it was not his primary duty to make suggestions as to the

different issues that came up during the project and he did not have authority or discretion to

implement his own ideas.  (Pusateri Decl., Ex. A, Pl's Depo. at 103:6-104:12.)  He only presented

Lennar with suggestions and Lennar decided whether they wanted to use it or not.  Id.  He states he

was given a printed schedule of the different subcontractors such as grading, blasting, sewer, water,

storm drain, curb gutter, landscaping, erosion control and a time schedule from the project manager.

(PNOL, Ex. 3, Pl's Depo. at 94:2-95:13.)  His job was to implement the schedule he was given.  (Id.)

If there were problems with the schedule, then Plaintiff would tell the project manager how long

something would take and the project manager would adjust the schedule.  (Id. at 97:15-98:6.)

Plaintiff further argues that the job description of an area manager does not give Plaintiff any

administrative duties.  (Supp. PNOL, Ex. 2.)  However, the standard to determine whether one is

exempt or not must be based on the actual nature of the duties performed by the employee and not

by an employee's title or job description.  See Reich v. John Alden Life Ins. Co., 126 F.3d 1, 10-11

(1st Cir. 1997) ("the particular title given to an employee is not determinative, as an employee's

exempt status must instead be predicated on whether his or her job duties and responsibilities meet

all of the applicable regulatory requirements")  Based on these opposing arguments and facts, there

is a disputed issue of material fact as to whether Plaintiff's duties involved the exercise of discretion

and independent judgment with respect to matters of significance.

The parties depict two different roles of Plaintiff's duties at Lennar.  Based on the disputed

facts, there is a genuine issue of material fact as to whether Plaintiff's primary duties were directed

related to management policies or general business operations of his employer or its customers and

whether Plaintiff exercised discretion and independent judgment with respect to matters of

significance.  Accordingly, the Court DENIES Defendant's motion for summary judgment as to the

claim for breach of contract for unpaid overtime.

**V.    Fourth Cause of Action:  Unfair Competition in Violation of California Business and Professional Code section 17200**

1        In the fourth cause of action, Plaintiff alleges that Defendant acquired moneys, unpaid

2   overtime wages, required to be paid under the labor laws that were owed to Plaintiff.  Plaintiff

3   argues that such act constitutes an unfair business practice under California Business and Profession

4   Code section 17200.  Defendant argues that since Plaintiff's claim for unpaid overtime fails, this

5   claim necessarily fails as well.  Plaintiff does not address this issue in his opposition.

6        Section 17200 provides a cause of action for "unfair competition," which is defined as "any

7   unlawful, unfair or fraudulent business act or practice."  Cal. Bus. & Prof. Code § 17200.

8   "Unlawful" practices include "anything that can properly be called a business practice and at the

9   same time is forbidden by law."  <u>Farmers Ins. Exch. v. Superior Court</u>,  2 Cal. 4th 377, 383 (1992).

10   Section 17200 "borrows" violations of other laws and treats them as unlawful practices

11   independently actionable under section 17200.  <u>Id.</u>  "Unfair" means any practice whose harm to the

12   victim outweighs its benefits.  <u>Olsen v. Breeze, Inc.</u>, 48 Cal. App. 4th 608, 618 (1996).

13   "Fraudulent" as used in the statute does not refer to the common law tort of fraud, but rather requires

14   a showing that members of the public are likely to be deceived.  <u>Id.</u>; <u>Bank of the West v. Superior</u>

15   <u>Court</u>, 2 Cal. 4th 1254, 1267 (1992).

16        Since the court has denied Defendant's motion for summary judgment as to the issue

17   regarding overtime compensation, the Court also DENIES Defendant's motion for summary

18   judgment as to the claim of unfair business practice.

19   **VI.**    **Fifth Cause of Action:  Unjust Enrichment**

20        Plaintiff alleges that Lennar was unjustly enriched by failing to pay Plaintiff for

21   "performance incentive compensation" and "overtime compensation."   Since the Court has denied

22   Defendant's motion for summary judgment as to the issue overtime compensation, the Court also

23   DENIES Defendant's motion for summary judgment as to unjust enrichment based on the

24   allegations regarding the "overtime compensation" claim.  Since the Court has granted Defendant's

25   motion for summary judgment as to the issue of the performance incentive compensation, the Court

26   GRANTS Defendant's motion for summary judgment as to that aspect of this claim.

27   **VII.**   **Defendant's Request for Judicial Notice**

28        Defendant filed a request for judicial notice as to its 2008 Form 10-K.  (D's Request for

Judicial Notice, Ex. A.)  The Court may take judicial notice of facts that are "not subject to reasonable dispute that is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  Plaintiff has not objected to the request for judicial notice.  However, since the Court has not utilized the Form 10-K in its ruling, the Court DENIES Defendant's request for judicial notice as to its 2008 Form 10-K filed with the Securities and Exchange Commission.

### Conclusion

Based on the above, the Court **GRANTS IN PART AND DENIES IN PART** Defendant's motion for summary judgment.  Specifically,

1)      as to the first cause of action, the Court GRANTS Defendant's motion for summary judgment as to the claim for disability discrimination and DENIES Defendant's motion for summary judgment as to the claim for age discrimination;

2)      as to the second cause of action, Court GRANTS Defendant's motion for summary judgment as to the claim for wrongful termination in violation of public policy;

3)      as to the third cause of action, the Court DENIES Defendant's motion for summary judgment as to the claim for breach of employment contract;

4)      as to the fourth cause of action, the Court DENIES Defendant's motion for summary judgment as to the claim for unfair competition;

5)      as to the fifth cause of action, the Court GRANTS in part and DENIES in part Defendant's motion for summary judgment as to the claim for unjust enrichment. The Court GRANTS Defendant's motion for summary judgment as to unjust enrichment regarding "performance incentive compensation" and DENIES Defendant's motion for summary judgment as to unjust enrichment regarding "overtime compensation."

/ / / /

/ / / /

/ / / /

The Court also DENIES Defendant's Request for Judicial Notice.

IT IS SO ORDERED.

DATED:  April 26, 2011

Hon. Anthony J. Battaglia
U.S. District Judge